UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIO LAMBOY RUIZ,<br><br>    Plaintiff,<br><br>    v.<br><br>MILLENNIUM SQUARE RESIDENTIAL ASSOCIATION, et al.,<br><br>    Defendants. | Civil Action No. 15-1014 (JDB) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Julio Lamboy Ruiz believes he obtained all the necessary approvals for certain architectural modifications he made to his condominium unit. The defendant owners' associations disagree and want Ruiz to return the unit to its original condition. The question before the Court today, however, is not which party is right—it is simply whether Ruiz must submit this dispute to arbitration. Although Ruiz acknowledges that an arbitration agreement in the condominium bylaws appears to cover this dispute, he contends that the arbitration procedures are so unfair as to be unconscionable, and thus the agreement cannot be enforced. But several of Ruiz's objections provide no basis for finding the arbitration provision unconscionable. And even though defendants have effectively conceded that, when read properly, the provision governing the selection of the arbitrators is unconscionable, the proper course is to sever that provision and enforce the heart of the parties' agreement: to arbitrate this dispute. The Court will therefore grant defendants' motion to compel arbitration.

## BACKGROUND

Because most of the details of the parties' dispute are not relevant to the issue presently before the Court, a short summary of the case will suffice. According to his complaint, Ruiz owns

1

a condominium unit at the Millennium Square condominium complex in northwest Washington, D.C. Compl. [ECF No. 1] ¶ 1. The complex is managed by defendants Millennium Square Residential Association and Millennium Square Unit Owners Association—for sake of simplicity, "the Associations"—who also enforce the condominium's bylaws. Id. ¶¶ 3–6.

In 2014, Ruiz sought to make a number of architectural modifications to the balconies and roof deck of his unit. Id. ¶ 9. He says he presented the relevant architectural plans to the Associations and properly sought their permission to proceed with the project. Id. ¶¶ 11–35. The Associations agreed to the modifications, or at least did not disapprove them within the time allotted by the bylaws, so Ruiz went ahead and had the work done. Id. In June 2015, however, the Associations sent Ruiz a letter stating that a number of the modifications had not been included in the plans he had submitted; in the Associations' view, these modifications had never been approved, and so needed to be removed. Id. ¶¶ 39–41; Ex. 8 to Compl. [ECF No. 1-11]. Ruiz then filed this suit, which seeks a judgment declaring that the modifications do not violate the condominium's bylaws and may remain in place. Compl. ¶¶ 45–53.

In response to Ruiz's complaint, the Associations have filed a motion asking the Court to stay the case and to compel Ruiz to arbitrate the dispute. Defs.' Mot. to Compel Arbitration [ECF No. 9]. Arbitration, they say, is required by the condominium's bylaws and therefore by the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq. Defs.' Mem. Supp. Mot. [ECF No. 9-1] at 5–7. Two provisions of the bylaws are relevant. Section 11.6, governing "Additions, Alterations, Renovations or Improvements," sets forth the mechanism for unit owners to seek approval for structural modifications. Ex. 7 to Compl. [ECF Nos. 1-7 to 1-10] at 63–64. It further provides that, "[i]n the event of any dispute which cannot be mutually resolved . . . such dispute . . . shall

be submitted to arbitration in accordance with Section 19.2 of these Bylaws." Id. at 64. Section 19.2(b), in turn, describes the arbitration process. It reads in full:

> Arbitration. Arbitration pursuant to these Bylaws shall consist of the appointment of an independent arbitrator by the members of the Board of Directors who are Residential Unit owners, the appointment of a second independent arbitrator by the members of the Board of Directors who are Commercial Unit owners and the appointment of the third arbitrator by the two previously appointed arbitrators. These arbitrators shall be requested to reach a decision within thirty (30) days after their appointment. The cost of arbitration shall be paid by the losing party unless the arbitrators determine that the cost should be a Common Expense. If the arbitrators determine that the action of the Board of Directors, the Unit Owners Association, the Residential Executive Committee, the Residential Association, the Commercial Executive Committee or the Commercial Association violates the Condominium instruments or has so prejudiced a Unit owners' [sic] interests, such action shall not be taken.

Id. at 101.

Ruiz opposes the Associations' motion. See Pl.'s Opp'n [ECF No. 10]. He does not deny that, as a general matter, he is bound by the terms of the bylaws. Nor does he deny that the disagreement over his modifications is a "dispute" covered by Section 11.6 and thus subject to arbitration. Instead, he argues that the arbitration system created by Section 19.2 is so unfair that it is unconscionable as a matter of contract law, and that the agreement to arbitrate is therefore unenforceable.

## LEGAL STANDARD

When considering a motion to compel arbitration, the proper legal standard for the district court is the same one used in resolving summary judgment motions under Federal Rule of Civil Procedure 56(c), "as if it were a request for summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008) (internal quotation marks omitted); see also Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 66–67 (D.D.C. 2003). The party

3

seeking to compel arbitration must present "evidence sufficient to demonstrate an enforceable agreement to arbitrate." Hill v. Wackenhut Servs. Int'l, 865 F. Supp. 2d 84, 89 (D.D.C. 2012) (internal quotation marks omitted). The burden then shifts to plaintiffs to show that there is a genuine issue of material fact as to the making of the agreement. Id. "The Court will compel arbitration if the pleadings and the evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fox v. Comput. World Servs. Corp., 920 F. Supp. 2d 90, 96 (D.D.C. 2013) (internal quotation marks omitted).

## DISCUSSION

The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In his initial opposition, Ruiz did not contest the Associations' premise that the bylaws are a contract within the scope of the FAA; he instead argued only that the arbitration agreement was not a valid provision of that contract. In supplemental briefing invited by the Court, however, Ruiz now argues that the bylaws are outside the FAA's scope entirely because they concern "real property located wholly within the District of Columbia and, as such, do not affect interstate commerce." Pl.'s Supp. Mem. [ECF No. 13] at 4. But "commerce" under the FAA is broader than Ruiz realizes: it covers not only "commerce among the several States," but also commerce "in the District of Columbia." 9 U.S.C. § 1 (emphasis added). Hence, the fact that the contract involves a transaction occurring entirely within D.C. does not remove it from the FAA's reach.[1]

---

[1] Although the Court rejects Ruiz's argument regarding the scope of the FAA, it notes that Ruiz himself does not contend that the issue is dispositive. In Ruiz's view, D.C.'s Revised Uniform Arbitration Act, D.C. Code § 16-4401 et seq., governs instead of the FAA, but he suggests that the two statutes are substantively equivalent in all

4

Ruiz's primary argument remains that, even if the bylaws are a contract covered by the FAA, the arbitration agreement is not valid. "Like other contracts," arbitration agreements subject to the FAA "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68 (2010) (internal quotation marks omitted). Whether an arbitration agreement is unconscionable is primarily a question of state contract law, see Perry v. Thomas, 482 U.S. 483, 492 n.9 (1987); Hoffman v. Citibank (S. Dakota), N.A., 546 F.3d 1078, 1082 (9th Cir. 2008), and the parties agree that D.C. law governs here. The question, then, is whether the bylaws' arbitration provisions are unconscionable under D.C. law.

In the District of Columbia, "[a] party seeking to avoid a contract because of unconscionability must prove two elements: an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." Curtis v. Gordon, 980 A.2d 1238, 1244 (D.C. 2009) (internal quotation marks omitted). "These two elements are often referred to as procedural unconscionability and substantive unconscionability." Urban Invs., Inc. v. Branham, 464 A.2d 93, 99 (D.C. 1983) (per curiam). "[I]n an egregious situation," a showing of only "one or the other [form of unconscionability] may suffice," id. (internal quotation marks omitted)—although there do not appear to be any reported D.C. cases finding such an "egregious" scenario.

Ruiz's argument for procedural unconscionability is rather weak. Proffering almost no evidence about the circumstances of his acquisition of the unit, Ruiz relies solely on the fact that he, like all unit owners, had no opportunity to bargain over the terms of the bylaws. This take-it-

---

respects relevant to this case. See Pl.'s Supp. Mem. at 5. The Court agrees, and cannot see how the remainder of its analysis would differ even if it were wrong about the scope of the FAA.

or-leave-it quality, he argues, makes the bylaws a contract of adhesion and therefore procedurally unconscionable. See Pl.'s Supp. Mem. at 2–3. In the Court's view, his argument stretches the concepts of contracts of adhesion and procedural unconscionability beyond what D.C. law recognizes. "A contract of adhesion is defined generally as one imposed upon a powerless party, usually a consumer, who has no real choice but to accede to its terms." Andrew v. Am. Imp. Ctr., 110 A.3d 626, 633 n.8 (D.C. 2015) (internal quotation marks omitted). The mere fact that a contract is take-it-or-leave-it does not render a party "powerless" and without "real choice." See Moore v. Waller, 930 A.2d 176, 182 (D.C. 2007). There must be something more: "a showing that the parties were greatly disparate in bargaining power, that there was no opportunity for negotiation and that the services could not be obtained elsewhere." Id. (internal quotation marks omitted). Absent this last condition, the party retains the "real choice" to simply go deal with someone else.

At the motion hearing, Ruiz argued that he could not go "elsewhere" because real estate is unique. The only place to get Millennium Square Unit PH3L, in other words, is at Millennium Square, and thus, says Ruiz, he had "no real choice" but to accept the bylaws. But this argument proves too much. As Ruiz acknowledged, this would mean that all condominium purchasers lack "real choice" with respect to bylaws and hence all condominium bylaws are procedurally unconscionable. This conclusion is both at odds with common sense—is the Wall Street magnate who buys a unit overlooking Central Park really "powerless" in any sense?—and unsupported by D.C. case law. In short, Ruiz's acquisition of a penthouse condominium (complete with "balconies and roof deck," Compl. ¶ 9) does not seem like the kind of transaction that the doctrine of procedural unconscionability is intended to guard against. Ruiz must therefore make a very strong case for the substantive unconscionability of Section 19.2.

That case consists of three objections. According to Ruiz, Section 19.2 is substantively unconscionable because: (1) it does not require the arbitrators to provide a written decision justifying their award; (2) it does not provide for discovery of any sort, and imposes an arbitration schedule that effectively bars discovery; and (3) it does not allow Ruiz to participate in the selection of the arbitrators. Pl.'s Opp'n at 3–6.

The first two objections fall flat, for nothing in D.C. law suggests that arbitration agreements without Ruiz's preferred characteristics are substantively unconscionable. In arguing that an arbitration agreement must provide for discovery and a written decision, Ruiz mistakenly relies on case law that required those characteristics to be present in agreements to arbitrate statutory rights. See Pl.'s Opp'n at 3 (citing Sapiro v. VeriSign, 310 F. Supp. 2d 208, 214 (D.D.C. 2004), in turn citing Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465 (D.C. Cir. 1997)). The D.C. Circuit has expressly held that the reasoning of the leading case in that line, Cole, "does not extend beyond the statutory context." Brown v. Wheat First Sec., Inc., 257 F.3d 821, 825 (D.C. Cir. 2001). There is no statutory claim here. Ruiz's claim—that he complied with the bylaws and therefore the modifications can remain—is a matter of common law contract principles. An agreement to arbitrate such a dispute need not meet Cole's criteria in order to be enforceable.

Apart from the inapposite Cole, Ruiz cites no authority to suggest that an arbitration agreement must require a written decision. On the contrary, the D.C. Court of Appeals has made clear that "[a]rbitrators . . . are not required to state the grounds for their decisions." Schwartz v. Chow, 867 A.2d 230, 233 (D.C. 2005); see also, e.g., Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 244 n.4 (1962) ("Arbitrators generally have no obligation to give their reasons for an award."). Hence, an arbitration agreement that does not expressly require a written explanation—but of course does not preclude one—can hardly be considered substantively unconscionable.

7

Nor does Ruiz have any authority (apart from Cole) for the proposition that an arbitration agreement is substantively unconscionable if it does not provide for certain discovery procedures. If Ruiz is arguing that the agreement affirmatively precludes discovery, he is simply wrong. Section 19.2 is silent with respect to discovery, thereby leaving the issue to the arbitrators' discretion. And contrary to Ruiz's suggestion, see Pl.'s Opp'n at 6, discovery is not foreclosed by Section 19.2's requirement that the "arbitrators . . . be requested to reach a decision within thirty (30) days after their appointment." If the arbitrators determine that discovery issues necessitate a longer arbitration period, they have the power to decline this "request[]."

That leaves only Ruiz's third argument: that Section 19.2 is substantively unconscionable because it gives Ruiz no say in the arbitrator-selection process. The Associations dispute the premise, arguing that Ruiz does get to play a role, but their reading of the bylaws is wholly unpersuasive. The text of Section 19.2 is straightforward: the first arbitrator is picked by "the members of the Board of Directors who are Residential Unit owners"; the second by "the members of the Board of Directors who are Commercial Unit owners"; and the third by the first two. There is no role for Ruiz. Recognizing that Section 19.2 is a problem, the Associations suggest that the trick is reading it in conjunction with Section 11.6. When the two provisions are read together, the Associations say, it becomes clear that each party to a dispute—including Ruiz here—gets to pick one of the first two arbitrators. Defs.' Reply [ECF No. 11] at 5. But this is nonsense. Section 11.6 merely identifies a category of disputes that "shall be submitted to arbitration in accordance with Section 19.2"; it says nothing to alter the procedure in Section 19.2, which clearly—if bizarrely—assigns the selection power solely to the Board of Directors. There is simply no way to read the bylaws as giving Ruiz a say.

One might expect the Associations to have an alternative argument—namely, that even if the bylaws do not let Ruiz pick one of the arbitrators, the arbitrator-selection provision is not substantively unconscionable, or is at least not "egregious." Indeed, the Court invited the Associations to address that issue head-on in supplemental briefing. See Order of Oct. 19, 2015 [ECF No. 12] at 1 (inviting supplemental briefing on "[w]hether the arbitrator-selection provision in this case, if it does not give plaintiff any role in the selection process, is so substantively unfair as to be 'egregious' under D.C. law" (emphasis added)). But the Associations have declined to make any argument that the selection provision remains enforceable if it means what Ruiz says it means. They argue exclusively (and unpersuasively) that the bylaws do, in fact, let Ruiz make one of the initial selections. See Defs.' Supp. Mem. [ECF No. 14] at 3–6. The Court views this failure to argue the point (despite an express invitation) as a concession by the Associations that if Ruiz's interpretation of the arbitrator-selection provision is correct—which the Court concludes it is—then the provision is indeed unenforceable. See Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011) ("Under [our adversarial] system, courts are generally limited to addressing the claims and arguments advanced by the parties. Courts do not usually raise claims or arguments on their own." (citation omitted)).

The unenforceability of the arbitrator-selection provision does not, however, doom the arbitration agreement in its entirety. The D.C. Condominium Act specifically provides that "[a]ll provisions of the condominium instruments"—which includes the bylaws—"shall be deemed severable, and any unlawful provision thereof shall be void." D.C. Code § 42-1902.08(a); see also id. § 42-1901.02(5) (defining "condominium instruments"). D.C. contract law also permits the severance of unenforceable contract terms. See Booker v. Robert Half Int'l, Inc., 413 F.3d 77, 83 (D.C. Cir. 2005) ("District of Columbia law . . . allows courts to sever provisions in violation of

9

public policy, while enforcing the remainder of the agreement."); Kenyon Ltd. P'ship v. 1372 Kenyon St. Nw. Tenants' Ass'n, 979 A.2d 1176, 1186 (D.C. 2009) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." (quoting Restatement (Second) of Contracts § 208)). The unconscionability of the arbitrator-selection provision thus demands only the severance of that provision, not the invalidation of the entire agreement to arbitrate.

Ruiz tries in vain to avoid this conclusion by dubbing the arbitrator-selection provision "integral" to the parties' agreement. Pl.'s Supp. Mem. at 5–7. Some courts, it is true, have held that if the specification of a particular arbitrator (or arbitral forum) was "integral" or "central" to the parties' agreement to arbitrate, then the subsequent unavailability of that arbitrator (or forum) precludes the court from compelling arbitration. See, e.g., Ranzy v. Tijerina, 393 F. App'x 174, 176 (5th Cir. 2010) (per curiam); In re Salomon Inc. S'holders' Derivative Litig. 91 Civ. 5500 (RRP), 68 F.3d 554, 560–61 (2d Cir. 1995). The basic idea behind these decisions is that sometimes a party's assent to arbitration depends on the availability of a specific arbitrator, and so their willingness to arbitrate before that arbitrator cannot be interpreted as a more general agreement to arbitrate.

But this case does not fit that mold. Section 19.2 does not specify a particular arbitrator or forum; it specifies a selection mechanism. Ruiz can hardly argue that the use of this selection mechanism was a condition of his assent. His primary argument, after all, is that the mechanism is so unfair to him that it cannot be enforced! Nor can he convince the Court that the Associations' assent depended on it. Their consistent (if mistaken) position is that the bylaws contain a different

mechanism that is less favorable to them, and yet they still wish to arbitrate. The equitable result, then, is to sever the arbitrator-selection provision while retaining the essence of the parties' agreement: to arbitrate this dispute. See Booker, 413 F.3d at 83–84 ("Compelling Booker to arbitrate with the bar on punitive damages severed is entirely consistent with the intent to arbitrate he manifested in signing the employment agreement in the first place.").

Although severing the arbitrator-selection provision leaves the bylaws without a mechanism for selecting an arbitrator, this is not fatal. Section 5 of the FAA provides that "if no method [for appointing an arbitrator] be provided [in an agreement], or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require." 9 U.S.C. § 5; see also Green v. U.S. Cash Advance Ill., LLC, 724 F.3d 787, 792–93 (7th Cir. 2013). Thus, if necessary, the Court could appoint an arbitrator. But it thinks (and hopes) that such direct involvement is unnecessary. Now that the Court has made clear that it will compel arbitration, it is confident the parties will be able to find a mutually satisfactory selection mechanism. The obvious solution is the one the Associations have already agreed to: Ruiz picks one arbitrator, the Associations pick another, and those two arbitrators pick a third. But the parties are free to choose a different method. And if the parties cannot agree on a method within 30 days, either party may make an application under FAA § 5.

The parties can also attempt to agree on more detailed arbitration procedures. Section 19.2 contains surprisingly little detail about how the arbitration will be conducted. Cf., e.g., 1 Domke on Commercial Arbitration § 8:20, Westlaw (database updated Aug. 2015) (recommending that

11

an agreement "state the number of arbitrators, the method of their appointment, the place of the arbitration and preferably the law to be applied, and the rules they wish to have adopted by the arbitrators"). But that lack of detail does not render the agreement unenforceable. Both parties agree that D.C.'s Revised Uniform Arbitration Act, D.C. Code § 16-4401 et seq., applies to their agreement. See Pl.'s Supp. Mem. at 4; Defs.' Supp. Mem. at 9. That act provides various default rules of arbitral procedure that can fill in some of the gaps in the bylaws. See Weiner v. Original Talk Radio Network, 2011 WL 873246, at *3 (N.D. Cal. Mar. 14, 2011) ("[A]s the parties have agreed that Oregon law applies to the contract, the Oregon Uniform Arbitration Act fills in any gaps in the agreement." (citation omitted)); cf. Queen v. Schultz, 747 F.3d 879, 889 (D.C. Cir. 2014) ("In the context of a partnership agreement, the default provisions in the District of Columbia [Uniform Partnership Act] can supply certain essential terms to which the parties never explicitly agreed.").[2] And insofar as the parties cannot now agree on other rules, the arbitrators themselves will decide. See 13D Charles Alan Wright et al., Federal Practice and Procedure § 3569, at 515–16 (3d ed. 2008) ("Generally, questions about arbitration procedure should be resolved in the first instance by the arbitrator.").

## CONCLUSION AND ORDER

For the foregoing reasons, the Court concludes that Ruiz entered into a valid agreement to arbitrate this dispute, and the unconscionability of the arbitrator-selection provision does not render that agreement unenforceable as a whole. Accordingly, it is hereby

---

[2] Of course, to the extent any provision of the D.C. Act conflicts with the FAA, it would be preempted. But the FAA says little about arbitration procedure. See Stephen L. Hayford, Federal Preemption and Vacatur: The Bookend Issues Under the Revised Uniform Arbitration Act, 2001 J. Disp. Resol. 67, 76 (2001) (noting that most "procedural" issues "are not addressed in the FAA and definitive federal court case law").

**ORDERED** that [9] defendants' motion to compel arbitration and stay proceedings is **GRANTED**; it is further

**ORDERED** that by not later than February 12, 2016, the parties shall inform the Court whether they have agreed on a mechanism for selecting arbitrators; and it is further

**ORDERED** that all proceedings in this case are **STAYED** pending the conclusion of the arbitration.

**SO ORDERED**.

/s/
JOHN D. BATES
United States District Judge

Dated: January 13, 2016